IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 23, 2012 Session

## CLAUDE F. GARRETT v. STATE OF TENNESSEE

**Appeal from the Davidson County Criminal Court**
**No. 92B96      Seth Norman, Judge**

---

**No. M2011- 00333-CCA-R3-PC - Filed September 5, 2012**

---

The Petitioner appeals the denial of his petition for post-conviction relief from his conviction for first degree felony murder. While the Petitioner raised a multitude of issues below, on appeal, his sole issue is whether he received ineffective assistance of counsel at trial. Specifically, the Petitioner makes the following arguments on appeal: (1) that trial counsel failed to present evidence that in the ten years between the first and second trials, the methods by which the State's expert witness reached his conclusion of arson had been discredited by the scientific community; (2) that trial counsel failed to advance the defense theory of an accidental fire by not calling as a witness the physician who treated both the Petitioner and the victim to testify regarding the burn patterns on their bodies; and (3) that trial counsel failed to move for a mistrial when the State and the State's witnesses referenced the Petitioner's prior trial. After a thorough review of the record, we affirm the judgment of the post-conviction court denying relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

James O. Martin, III, Nashville, Tennessee, for the appellant, Claude F. Garrett.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel and Aaron Winter, Assistant Attorneys General; Victor S. Johnson, III, District Attorney General; Jon Seaborg, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Background Facts and Procedure

Claude F. Garrett ("the Petitioner" or "the Defendant") appeals the denial of his petition for post-conviction relief, asserting that he received ineffective assistance of counsel at trial. The Petitioner's conviction for first degree murder arose from a charge that on February 24, 1992, he set fire to the Davidson County home that he shared with the victim, Lori Lance. The victim, who was the Petitioner's girlfriend, was found by firefighters behind a closed door inside a utility room in the rear of the house. She died from smoke and gas inhalation. The State's evidence showed that the utility room door was latched from the outside and that an accelerant was used to start the fire.

The Petitioner originally was convicted by a jury in 1993 of first degree felony murder and sentenced to life imprisonment. The Petitioner's conviction was affirmed on direct appeal. See State v. Claude Francis Garrett, No. 01C01-9403-CR-00081, 1996 WL 38105 (Tenn. Crim. App. Feb. 1, 1996). He subsequently filed for post-conviction relief, alleging that the State had withheld exculpatory evidence. On appeal from the trial court's denial of post-conviction relief, this Court determined that the State, in fact, had withheld exculpatory evidence, and we vacated the Petitioner's conviction and sentence and ordered a new trial. See Claude Francis Garrett v. State, No. M1999-00786-CCA-R3-PC, 2001 WL 280145 (Tenn. Crim. App. March 22, 2001). At his second trial, in 2003, a jury again convicted the Petitioner of first degree felony murder, and he was sentenced to life imprisonment. This Court affirmed the conviction on direct appeal. See State v. Claude Francis Garrett, No. M2004-02089-CCA-R3-CD, 2005 WL 3262933 (Tenn. Crim. App. Dec. 1, 2005), perm. app. denied (Tenn. May 1, 2006).

On April 17, 2007, the Petitioner filed a *pro se* petition for post-conviction relief, which was amended by appointed counsel on April 6, 2010. The amended petition, which incorporated the *pro se* petition by reference, set forth three principal grounds for post-conviction relief: (1) that new scientific evidence established that the Petitioner was innocent of the offense for which he was convicted; (2) that the Petitioner received ineffective assistance of counsel at his second trial; and (3) that the trial court abused its discretion in allowing the State's expert witness, James Cooper, to testify.

After an evidentiary hearing held August 30, and October 13, 2010, the post-conviction court denied the petition, and the Petitioner now appeals. On appeal, the Petitioner's sole argument is that he received ineffective assistance of counsel at his second trial. From our review of the Petitioner's appellate brief, we discern three facets to his ineffective assistance of counsel claim: (1) that trial counsel failed to present evidence that

in the ten years between the first and second trials, the methods by which the State's expert witness Cooper reached his conclusion of arson had been discredited by the scientific community; (2) that trial counsel failed to advance the defense theory of an accidental fire by not calling the treating physician, Dr. Robert Roth, as a witness regarding the burn patterns on the bodies of the Petitioner and the victim; and (3) that trial counsel failed to move for a mistrial when the State and the State's witnesses referenced the Petitioner's prior trial.

A more thorough summary of the facts adduced at trial can be found in this Court's opinion on direct appeal. See Claude Francis Garrett, 2005 WL 3262933, at *1-9. In the interest of clarity and conciseness, we will limit our recitation of the facts below to those relevant to the issues the Petitioner raises on appeal.

## *Daubert Hearing*

Prior to the second trial, the Petitioner challenged the qualifications of the State's expert witness, Federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") Agent James Cooper. The trial court subsequently held a Daubert hearing to test Cooper's qualifications. While testifying as an expert at the first trial, Cooper had opined that the fire's area of origin was in the living room in the front of the house. In part, he based his conclusion of arson on the existence of a "pour pattern" on the living room floor, which Cooper maintained was indicative of the use of an accelerant by the arsonist. At the Daubert hearing, trial counsel declared that he wished to voir dire Cooper "both on his qualifications and his ability to render a scientific opinion that there was a pour pattern" in the house.

Cooper noted at the hearing that he had been qualified to testify as an expert in the field of arson investigation at the first trial in 1993. Cooper discussed his educational and professional qualifications, which included current certification as a fire investigator by the International Association of Arson Investigators. Cooper went into management for the ATF in 1994, at which point he participated in fire investigations in a supervisory role only. At the time of the Daubert hearing, Cooper had retired from the ATF and no longer performed fire investigations. Cooper said that he had received instruction in fire science, which he defined as "the study of fire behavior," but he did not consider himself an expert in the field. Cooper stated that when trying to determine the cause of a fire he would analyze the fire scene and conduct interviews with witnesses.

Trial counsel then began to ask questions related to Cooper's investigation of the fire in the present case. The State objected that trial counsel was attempting to conduct discovery rather than challenge Cooper's expertise. Trial counsel responded that he was attempting to show that Cooper was unable to render an opinion regarding a pour pattern in the house. The

trial court allowed him to question Cooper further. Trial counsel then questioned Cooper extensively regarding his methodology investigating this particular fire. Cooper responded that, in determining the cause of the fire, he looked at several factors and did not exclusively focus on the pour pattern. The most important factor to Cooper was whether the utility room door where the victim had been found was indeed locked. He also cited the presence of a bedspread soaked in kerosene as a key factor in his determination. He stated that the pour pattern on the floor was "not the only thing that was significant in my determination" and that he could "[p]robably not" make a determination of arson based solely on the pour pattern.

Trial counsel asked Cooper whether he was familiar with the United States Fire Administration Fire Burn Pattern Tests, and Cooper replied that he was not. Trial counsel continued:

> Q: . . . Now, floor patterns produced by the ignition of an ignitable liquid were not always visible after a fire which produced flash over conditions. Would you agree with that?
>
> A: It all depends on what type of liquid it was . . . .
>
> Q: It was observed that flash over also produced patterns on the floor as a result of the pyrolysis or ignition of the floor surface?
>
> A: Again, all depends on those variables and the condition of that room.

Shortly after this exchange, the trial court ended the hearing after determining that Cooper's testimony was "based on sound information and belief." Cooper was thus allowed to testify as an expert at trial.[1]

---

[1]Although the State questioned Cooper extensively regarding his qualifications as an expert witness, it does not appear from the trial transcript that the State actually proffered him before the jury as an expert. However, we note that on appeal the Petitioner raised as an issue the admission of Cooper's expert testimony, and this Court determined that the trial court did not err in allowing Cooper to testify as an expert. See Claude Francis Garrett, 2005 WL 3262933, at *15-17. Thus, we do not discern any contention regarding the fact that Cooper testified as an expert witness at trial.

*Evidence at Trial*

In our prior opinion, we summarized Cooper's trial testimony:

James Cooper testified that he had retired as an agent of the United States Department of Treasury Bureau of Alcohol, Tobacco and Firearms (ATF). As an ATF agent, he had been a certified fire investigator and a fire-cause and origin specialist. Because local authorities had requested that he assist in investigating the fire that killed the victim, he inspected the house on the evening of February 24, after the fire department had washed the flooring with a booster hose. He opined that the washing did not obstruct or hamper his observation of the burn pattern. He concluded that the fire began in the front room. He found no evidence of an electrical or other accidental cause of the fire. A kerosene heater found in the bedroom was not the cause of the fire. He discovered a saturation of kerosene in the kitchen. The utility room door was closed during the fire. Mr. Cooper testified that [Metro Fire Department Captain] Otis Jenkins told him that he had "had to use two hands to slide the bolt on the latch to the other side to open the door."

Mr. Cooper testified that he collected material from beneath the baseboard in the front room because liquid spilled in the floor would typically run under a baseboard and because the flooring beneath the baseboard was free of foot traffic occurring during and after the firefight. Also, he found a "V" pattern on the baseboard, which to him was "like a red flag waving at you," indicating an accelerated fire. Mr. Cooper presented a number of pictures and slides of the fire scene. He opined, "[T]his was a deliberately set fire, arson. Somebody went into the house, and their design, their intent, was to spread the fire from the front room to the back where the victim was."

Defense counsel engaged Mr. Cooper in a rigorous cross-examination, during which the witness testified that the kitchen floor contained "[q]uite a bit of water," that a portion of the liquid on the bedspread was water, and that he relied upon Detective Miller's report of his interviews of the firefighters and did not interview them personally other than to talk with Otis Jenkins. Mr. Cooper did not see the house before the booster-hose cleansing and did not see the front-room furniture in its pre-fire position. He insisted, however, that the flooring in the front room evinced a "pour pattern," indicating that a liquid accelerant had been poured in the floor. He admitted that polyester from furniture could melt onto the floor and simulate a pour pattern but maintained that he could distinguish a pour pattern from a polyester meltdown. He

admitted that one photograph showed that the latch bar was dark, as if it was coated in carbon, which might indicate that the bar was not inserted into the latch housing during the fire.

Claude Francis Garrett, 2005 WL 3262933, at *6-7.

For purposes of this opinion, we supplement our prior summary of Cooper's testimony with the following relevant facts. During cross examination, trial counsel asked Cooper to describe "flashover." Cooper explained that flashover occurs when "everything in [a] room reaches its combustible ignition." As a fire in a room grows, superheated gases rise until they become trapped by the ceiling and begin to bank down towards the floor. Eventually, the "whole room will be in fire, from the ceiling down to the floor. That is a flashover." Cooper acknowledged that the living room in this case appeared to have been fully involved in fire. Cooper also acknowledged that flashover can occur with or without the use of an accelerant and that the radiant heat caused by flashover can create burn patterns on the floor because the heat ignites the floor.

Trial counsel asked Cooper whether he could distinguish burn patterns on a floor caused by radiant heat from those created after pouring and igniting an accelerant on the floor. Cooper answered:

[R]adiant heat normally, normally, will burn, coming from the ceiling down, uniformly, even. A pour pattern will be irregular and into the floor[,] into the wooden material. But the radiant heat can, also, indicate a pour pattern if the air movement changes. As an investigator you have to realize that. And that's why you have to be careful not to jump the gun. I am satisfied in front of that door, inside the front door, is radiant heat. I am satisfied in the center of the living room, near that window, there is a pour pattern.

Trial counsel asked Cooper on what scientific basis he formed his opinion that a pour pattern existed on the living room floor. Cooper replied that he used his experience and training in determining the presence of a pour pattern. Cooper elaborated:

I have set fires . . . pouring things. I have spilt [sic] things, to see the difference in an accidental spill and a deliberate pour. I have talked to other investigators, where they call radiant heat arson. They call it a pour pattern. Through my training, I can make that distinction from pour pattern versus radiant heat. Now radiant heat can be irregular. It all depends on what is going on inside the interior of that building at the time.

When asked about the possibility of error in his analysis, Cooper responded:

I don't know. I mean, all I can testify to is, I've done pours. I've done accidental spills. I have been on another fire fatality where another investigator called radiant heat a pour pattern, and I actually said, it is radiant heat. Just through my training and experience.

. . . [I]f I'm proven wrong I will admit I am wrong. But on this one, no sir. I was there. I saw it with my eyes. And, I know the difference in radiant heat and a pour pattern, sir.

Trial counsel then asked Cooper whether he performed his fire investigations using the scientific method, which trial counsel defined as "defining a problem, collecting relevant data, and then analyzing that data and applying it to the problem." Cooper replied that he did so in this case. Cooper explained that when forming his hypothesis certain things stood out:

[A]ll these abnormal things come together[.] [N]ot one thing stands by itself. The pour pattern in the living room does not stand by itself. You have to have the bedspread. You have to have the kerosene can. You have got to have that latch on the door. You have got to have the smoke alarm.[2] And you have got to have where [the victim] was found, and what was on top of [the victim]. That is the hypothesis. The hypothesis is the cause of the fire, which was arson. . . .

In addition to the burn patterns on the floor, the burn patterns on the bodies of the victim and the Petitioner were a contested issue at trial. The State's evidence showed that the victim most likely received her burns in the utility room. As set out in our previous opinion,

The forensic pathologist[, Dr. Gretel Harlan,] who performed an autopsy on the victim testified that the victim died from inhaling smoke and noxious gases, probably succumbing within 10 to 30 minutes after she began to breathe smoke. The victim's blood alcohol level was .06 percent. The physician testified that the victim had burns on her head and left arm and that the burns probably resulted from heat build-up in the utility room where the victim was found. Other than the burns, the victim's body had suffered no other trauma. The physician opined that fire victims will frequently retreat to

---

[2] The evidence at trial showed that firefighters found a smoke detector without batteries or a cover lying on either the washer or dryer in the utility room. Claude Francis Garrett, 2005 WL 3262933, at *5.

a room away from the fire and have been known to burrow under objects to protect themselves.

Claude Francis Garrett, 2005 WL 3262933, at *3.

The defense's theory at trial was that the fire was accidental. As part of this strategy, the defense sought to prove that the burn patterns on the living room floor were caused by radiant heat during flashover. The defense also sought to prove that the burn patterns on the bodies of the victim and the Petitioner were similar. The defense proposed that the similarity of their burns proved that they had been exposed to the fire at the same time, thus negating the possibility that the Petitioner locked the victim in the utility room and started the fire. In this Court's prior opinion, we summarized the testimony of the defense's expert witness, Stuart Bayne:

> Stewart[3] Bayne testified for the defendant as an expert in fire investigation and fire science. He acknowledged that he did not visit the scene of the fire until after the house had been restored but maintained that he has testified in other cases despite being unable to personally inspect the fire scene. In the present case, he studied the records from the first trial, interviewed the firefighters, and examined the pictures.

Id. at *8.

Testifying at trial, Bayne summarized the defense's theory as follows:

This fire was a Class A fueled with paper and plastic fabrics, accidental naturally growing, meaning unaccelerated by any petroleum compound type fire. Secondly, analysis of the burn patterns on Ms. Lance and Mr. Garrett prove that Ms. Lance and Mr. Garrett were exposed to that fire at the same point in time with the fire as the fire growth. Furthermore, their burn patterns indicate a directional quality to the fire, and a height in the room to the fire. My findings included that this fire was not fueled by kerosene, the point of origin was not on the floor, rather it was in the love seat. And the ignition source was the carelessly dropped cigarette from an intoxicated, wasted as it were, person.

As we stated in our prior opinion:

---

[3] It appears that Mr. Bayne's first name was misspelled in the trial transcript, and, consequently, in our opinion on direct appeal.

Mr. Bayne elaborated that based upon the medical reports, the victim and the defendant sustained burns on their faces and left arms as a result of being exposed to the flames in the living room at the same time. He opined that because the burns were on the upper portions of the victim and the defendant, the fire did not originate in the floor. He believed that the burns on the couple were consistent with them trying to reach the front door and with the defendant's statement to him that, after a night of drinking, the couple returned home and smoked cigarettes, with the victim falling asleep on the love seat and the defendant falling asleep on the couch.

Mr. Bayne opined that the fuel load in the front room, including the furniture and the wood paneling covering the sheetrock walls, explained the fire growth. He opined that the defendant did not receive his burns from igniting kerosene and that it was "impossible" for the victim to have received her burns from inside the utility room. He dismissed the burn pattern on the front room floor as resulting from radiant heat or "flash over."

Mr. Bayne testified that the utility room door edge had scuff marks which indicated that the door stuck in the door frame. He testified that the defendant confirmed to him that the door tended to stick. Mr. Bayne opined that the latch bar was "very carbonized."

On cross-examination, Mr. Bayne testified that in reaching his conclusions, he ignored Otis Jenkins' claim that the utility room door had been latched. He declined to say how much time elapsed between the deposit of a lit cigarette in the love seat and the onset of a blaze, although he suggested that the process could take minutes or hours. He opined that the presence of the plastic container of kerosene in the kitchen was irrelevant to the cause of the fire. He conjectured that because the container had three holes in the top, the firefighters or investigators could have sloshed some of the kerosene onto the bedspread.

Id. at *8-9.

In addition to these facts, we note that Bayne testified that the alleged area of origin had "a very uniform floor burn pattern indicative of radiant heat and flash over." Regarding the burn injuries to the bodies of the victim and the Petitioner, Bayne disagreed with Dr. Harlan's conclusions. Bayne explained that burn patterns on bodies can tell an investigator about the relative intensity of a fire, the direction of the heat source relative to a person's

body, and a fire's developmental timeline. Bayne reviewed the medical records and autopsy in this case, and he compared and analyzed the burn patterns on the victim and the Petitioner. Bayne asserted that the body burns were consistent with the version of events that the Petitioner had relayed to him. He testified that the Petitioner had told him that the Petitioner had awoken to a fire, grabbed the victim's hand, and headed to the front door, exposing their left sides to the fire. At that point, as the Petitioner was attempting to open the front door, the victim retreated into the house. Bayne said that it was "impossible" for the victim to have received her burns in the utility room because the utility room never reached a temperature adequate to deliver the particular types of burns that the victim sustained. Bayne also explained that kerosene is not volatile or flammable like gasoline and will not explode upon ignition. Thus, the Petitioner could not have received his burns by igniting kerosene. After comparing the burn patterns for the jury, Bayne opined that "those two human bodies were standing in the same place at the same time in the relative intensity of the fire, from the growth of the fire."

After hearing this and other evidence, the jury found the Petitioner guilty of first degree felony murder. He was sentenced to life imprisonment. His conviction was affirmed on appeal, and he filed the instant petition for post-conviction relief alleging ineffective assistance of counsel.

*Evidence at Post-Conviction Hearing*

A post-conviction hearing was held over two days, August 30, and October 13, 2010. At the hearing, the post-conviction court heard the testimony of John Joseph Lentini, trial counsel, Bayne, the Petitioner, and Dr. Robert Roth.

Lentini testified as an expert in the field of fire analysis and fire science. Lentini stated that he had personally investigated over 2,000 fires but that he primarily reviews the fire investigations of others. Lentini is certified by the National Association of Fire Investigators and the International Association of Arson Investigators ("IAAI"), and he discussed in detail his education, qualifications, and peer-reviewed publications.

Lentini claimed to be familiar with the history and development of fire science and investigation. He defined "fire science" as "the application of the laws of chemistry and physics to the investigation of fires." Lentini said that he is a member of the National Fire and Protection Association ("NFPA") Technical Committee, which is responsible for the maintenance of NFPA 921, Guide for Fire and Explosion Investigations. Lentini stated that NFPA 921 presently represents the standard of care in fire investigations. In 1985, the NFPA Standards Council "became concerned about the quality of work that they saw in fire investigations" and produced NFPA 921 as a guide for fire investigators. NFPA 921 was

first published in 1992 and gained gradual acceptance over the following years. According to Lentini, in 2000, the United States Department of Justice embraced NFPA 921 as a benchmark and the IAAI called it the de facto standard of care. Lentini stated that it was the embrace of the scientific method that led to the acceptance of NFPA 921 as the standard of care in the field. On cross-examination, Lentini acknowledged that NFPA 921 had undergone revisions since its original publication in 1992. Lentini believed that such revisions represented a feature of NFPA 921 as it is "constantly reviewed by the fire investigation community, commented on, and maintained as a standard."

Lentini discussed certain "mythologies" of arson investigation, which he claimed many arson investigators previously embraced but have since been discredited by the scientific community. Lentini read from a National Academy Report on the State of Forensic Science issued in February, 2009.[4] Specifically, the concluding paragraph of the report's discussion on fire and arson investigation, stated as follows:

> By contrast, much more research is needed on the natural variability of burn patterns and damage characteristics and how they are affected by the presence of various accelerants. Despite the paucity of research, some arson investigators continue to make determinations about whether or not a particular fire was set.

> However, according to testimony presented to the committee,[5] many of the rules of thumb that are typically assumed to indicate that an accelerant was used (e.g., alligatoring of wood, specific char patterns) have been shown not to be true. Experiments should be designed to put arson investigations on a more solid scientific footing.

Lentini testified that he had reviewed portions of the record in this case, including Cooper's trial testimony,[6] Cooper's investigation report, and photographs of the fire scene. Lentini stated that from reviewing the photographs, "it was pretty clear that the fire originated in the living room, [and] it was pretty clear that it went to flashover." Lentini explained further that,

---

[4] The report itself was not entered into evidence.

[5] Lentini indicated at the post-conviction hearing that he was the person who offered this testimony to the committee.

[6] Notably, on cross-examination, Lentini stated that he had only read Cooper's testimony from the first trial.

When fires achieve flashover, they light the floor on fire. A lot of time – in fact, early in my career that was considered to be a suspicious thing because fires burn up and the floor shouldn't burn, but it is now pretty well accepted that when a room becomes fully involved one of the things that is going to burn is the floor and you, typically, get irregular burns on the floor.

When asked whether he had identified any "mythology" in this case, Lentini responded:

> The only mythology is the belief on the part of the investigator that he can, by looking at the floor, determine the difference between charring done by radiation and charring caused by a flammable liquid.

> Then he goes one step further and believes that he can tell the difference between flammable liquid charring caused by a spill, an accidental spill, or flammable liquid charring caused by an intentional pour, and that is just beyond the scope in terms of what is valid or what is generally accepted as valid in fire investigation.

Trial counsel also testified at the post-conviction hearing. At the time of the hearing, trial counsel had practiced criminal defense law for fifteen years. Trial counsel represented the Petitioner in his prior successful post-conviction proceedings and continued to represent the Petitioner during the second trial. Trial counsel recalled hiring Bayne as an expert in arson investigation to assist the defense in proving that the fire had not been intentionally set. Trial counsel relied on Bayne to assist him in preparing for and examining the State's expert witnesses. He stated that he had "lots of meetings" with Bayne in preparation for trial.

Bayne, who qualified as an expert at the second trial, was also qualified as an expert in fire analysis at the post-conviction hearing. He stated that he first became involved in the case in the fall of 2001. He explained that his role on the defense was to "render an independent origin and cause determination" as to the fire and to offer his analysis at trial. In order to do so, he communicated with trial counsel and the Petitioner, reviewed the case file, and interviewed firefighters who responded to the scene. He explained that all of his efforts were "toward rendering a technically defensible opinion."

Trial counsel planned to use Bayne's expertise to show that flashover had occurred and that the radiant heat caused by flashover had caused the burn patterns on the floor. Trial counsel also intended to use Bayne's testimony regarding the burn patterns on the bodies of the victim and the Petitioner to advance the defense's theory that the two had been in close proximity to one another at some point during the fire.

-12-

The Daubert motion in this case was the first one that trial counsel had ever filed, and, in order to prepare it, he consulted with other attorneys. Trial counsel stated that the purpose of the hearing was to demonstrate to the trial court that "Cooper's testimony was not scientifically based." In trial counsel's opinion, Cooper's testimony "was a lot of guess work and it was not based on science." He explained, "It was my belief that [Cooper's] conclusions were not scientifically based, and they weren't something that could be supported through other scientific evidence known to people who investigate arsons."

A series of March 4, 2003 emails between trial counsel and Bayne sent in preparation for the Daubert hearing showed the defense's plan to attack Cooper's testimony. In one email, Bayne told trial counsel:

> Today, I re-read Cooper's testimony and have several things to say about Cooper's determination that he saw "pour patterns."
>
> . . . .
>
> Cooper failed to conduct an adequate fire scene examination according to today's accepted scientific methodology (NFPA 921, 2.1, especially figure 2.3 and specific methodologies mentioned in various chapters and sections)[.]
>
> . . . .
>
> Cooper's conclusion that pour patterns existed on the living room floor is a conclusion drawn out of context and absent any analysis of: the furniture (what it was made of and what it added to the fuel load; he has no clue what furniture was present, nor how much); what interior surfaces existed (paint, wallpaper, curtains, blinds, fabrics hanging down, ceiling fan, plastic light fixtures in the middle of or around the living room); whether or not the floor was carpeted; what was on the ceiling or walls that could have dropped down; how the concrete wall of the front of the house radiated heat from this fire into spaces where no furniture existed right down to floor level (so the patterns away from the front door area would understandably look irregular).
>
> . . . .
>
> My literature sources are "NFPA 921", "Kirk's fire investigation (4th edition)" and "Chemical Analysis for the Arson Investigator and Attorney".
>
> . . . .

-13-

NFPA 921 is the one and only document that represents the consensus of the fire investigation community.

In a second email, Bayne wrote that he understood trial counsel wanted him to, *inter alia*, "provide rebuttal testimony about pour pattern recognition," "provide specific questions to ask Cooper at the pretrial hearing," and "provide input on attacking the science used by Cooper." In a third email, Bayne wrote, "much new evidence has come to light from testing (since 1992) to show that one cannot distinguish pour patterns from other solid-fuel induced patterns by the patterns themselves without incorporating the space, the structure, and the furnishings within the space in question." In the same email, Bayne told trial counsel that the evidence Cooper intended to offer was not generally accepted in the scientific community, "especially since 1992." Bayne wrote that in order to rebut Cooper's testimony regarding the pour pattern, "I will use the most commonly accepted publications in the industry and the best consensus document in the field (NFPA 921)." However, Bayne also cautioned trial counsel that he would "lose this [Daubert] challenge because [Cooper] possesses the credentials on paper."

In a May 16, 2003 document, Bayne recommended that trial counsel ask Cooper "technical questions" related to flashover conditions and effects. Bayne also recommended trial counsel ask Cooper what the "current fire technology journals, books, and other treatises say about the damages inflicted upon wood and carpeted floors at flashover- and during post-flashover-condition fires." However, Bayne warned trial counsel that "[t]he problem with this line of questioning is that [Cooper] will be responding as one who has learned much in the 11 years since the fire, when he probably could not have answered these questions adequately in 1993."

In his testimony at the post-conviction hearing, the Petitioner remembered the Daubert hearing being "cut off" with a "hasty ruling" and that all of the questions the defense had planned to ask were not entered into the record. During the hearing, trial counsel did not question Cooper specifically about NFPA 921 or about scientific advances in fire science since the first trial. Trial counsel admitted at the post-conviction hearing that he "was kind of beating around the bush a little bit. I was approaching it a little bit from afar, but I was trying to get to a point where I could convince [the trial court] that, as the gatekeeper of the evidence, he should keep this evidence out." Trial counsel acknowledged that after the trial court's ruling, he did not file an interlocutory appeal, although he could not recall the reason.

In preparation for trial, Bayne sent several emails to trial counsel discussing his findings regarding the cause of the fire and various strategies for effectively communicating his conclusions at trial. At the post-conviction hearing, Bayne identified an email to trial counsel in which Bayne relayed his belief that flashover occurred. Bayne also identified a

document that he prepared titled "Bayne Direct Testimony," which contained proposed questions for his direct examination. Bayne gave several examples of questions on the list that trial counsel did not ask him. Notably, the proposed list of questions for Bayne's direct examination does not contain questions related to NFPA 921 or changes in the understanding of fire science related to pour patterns in the years between the two trials.

Bayne also discussed several excerpts from the 2001 edition of the NFPA 921, which he claimed that he intended to discuss at trial but was not questioned about by trial counsel. Bayne said that one of the excerpts illustrated "graphically how a fire grows and what happens with the influence of radiant heat in pre-flashover conditions, flashover conditions, and post-flashover or full room involvement." Another excerpt showed the "approximate radiant heat flux" required to cause certain burn injuries to human skin.

Bayne also identified an email exchange with trial counsel in which the two discussed what testimony should be elicited through which witnesses. Bayne explained that this email contained information that he did not believe he could testify to at trial because he lacked first-hand knowledge. Bayne intimated that introducing this testimony through other witnesses would connect it to his own testimony. In one email, Bayne instructed trial counsel to ask Cooper about "his uncertainty about the floor burn patterns in the living room," as well as "his respect for NFPA 921."

Bayne stated that he was not present in the courtroom when Cooper testified at trial and that trial counsel did not review Cooper's testimony with him before he testified. Consequently, Bayne could not address particular discrepancies that he had with Cooper's testimony. Trial counsel stated that he may not have asked the trial court to allow Bayne to stay in the courtroom because he "may not have been aware" that experts could be allowed to remain in the courtroom. Bayne, having reviewed Cooper's trial testimony before the post-conviction hearing, said that trial counsel did not adhere to the questions he had advised trial counsel to ask Cooper. Said Bayne: "[Trial counsel] did not follow my lead, the questions were disjointed, and they didn't connect with the path or the line of reasoning that I provided him." Trial counsel, for his part, believed that he had been able to communicate the defense's theory through Bayne's testimony.

The Petitioner also claimed in his petition that trial counsel performed ineffectively by failing to call his treating physician, Dr. Robert Roth, as a witness at trial. At the post-conviction hearing, trial counsel acknowledged that Bayne was "consistent and persistent" in his argument that the patterns of the burn injuries on the bodies of the victim and the Petitioner "were an important piece of evidence." Trial counsel explained that Bayne's investigation supported the theory that the Petitioner and the victim had been "at some point in the fire in close proximity with one another because they both had similar burns on them."

Trial counsel identified his own handwritten note, written in preparation for the trial, in which he stated that "Mr. Bayne can testify with 99% certainty that the defendant and the victim received the same damaging exposure to heat from the same fire, at the same time, same direction." In a subsequent email, Bayne told trial counsel that the victim could not have received such burns in the utility room because the burns resulted from "fire/radiant heat generated by fire." In another email to trial counsel, Bayne wrote:

> I really think that the burn patterns that were observed, described, and pictured on [the Petitioner and the victim] are very important because they match almost to the "T". I mean, really important. One cannot produce the same relative patterns and intensity on two people's bodies unless those two people were in the same relative location and exposed to the same heat flux at the same point in time.

In Bayne's view, Dr. Roth, who treated both the Petitioner and the victim at the hospital, was an important defense witness because he could corroborate Bayne's opinion regarding the body burns. In an email, Bayne wrote to trial counsel, "Dr. R.M. Roth: treated defendant at the hospital; is an important witness for us. He can reinforce what I want to opine, namely that the two sets of burn patterns on the defendant and the victim came from the same direction, intensity, and moment in time."

Trial counsel identified a subpoena that was issued and served upon Dr. Roth. Trial counsel could not remember why he did not call Dr. Roth. He indicated that the reason may have been that the same evidence had been introduced through the testimony of the State's medical examiner, Dr. Harlan. When asked whether Dr. Harlan's testimony that the victim could have received her burns while in the utility room advanced the defense's theory, trial counsel acknowledged that it did not. On cross-examination, trial counsel stated that he did not recall why he did not call Dr. Roth but that he "made some kind of decision at the time that I didn't feel he was necessary."

The Petitioner testified that he understood Dr. Roth's testimony was intended to support Bayne's opinion about the burns on the Petitioner's and the victim's bodies. The Petitioner testified that trial counsel did not tell him why he did not call Dr. Roth. On redirect, trial counsel was asked, "If Mr. Bayne had told you that Dr. Roth was a necessary witness, would you have followed him based on his expertise and called him?" Trial counsel replied that he did not remember Bayne's telling him that, "but if he did, I probably should have heeded his words."

Bayne testified that his understanding of the importance of Dr. Roth's testimony was to "offset Dr. Harlan." Bayne believed that Dr. Harlan "was going to testify . . . that [the

victim] received her burns while she was in the utility room," which Bayne asserted was not possible. Bayne said that he expected Dr. Roth to testify at trial that the burns the doctor observed on both the victim and the Petitioner were "approximately equal in intensity, depth of char, and body location between the two different bodies." Bayne believed that the similarity of the burn patterns caused the "State's case to fail." Bayne said that he had expressed the critical importance of this evidence to trial counsel for eighteen months prior to trial. Bayne was surprised when he learned that trial counsel had released Dr. Roth without calling him to testify. Bayne could not remember whether trial counsel explained to him his decision to release Dr. Roth. Bayne guessed that trial counsel had told him that he already had introduced the evidence he needed, and therefore, he did not need Dr. Roth's testimony.

Dr. Roth testified at the post-conviction hearing. He stated that he was the emergency room physician who treated both the victim and the Petitioner on the night of the fire. Dr. Roth indicated that the victim had burns on her face, abdomen, hands, arms, and neck. He could not recall whether she had burns on her legs. Dr. Roth testified that the Petitioner had singed hair, eyebrows, and hands, as well as second degree burns on his left biceps and the dorsum of his left hand. Dr. Roth acknowledged that the locations of the burns on the victim and the Petitioner were "similar in pattern." He also acknowledged that the burns were consistent with "exposure to a very intense heat source" and said that "they were both exposed to similar amounts of heat causing types of destruction." Dr. Roth could not testify whether the burns were consistent with the victim and the Petitioner moving at the time of exposure or with their exposure to the same heat source at the same time.

Dr. Roth vaguely recalled being subpoenaed to testify in this case and stated that he had been available to testify. On cross-examination, he stated that, had he been called to testify at the trial in 2003, his testimony would have been the same as it had been at the post-conviction hearing.

*Post-Conviction Court's Findings*

After hearing this testimony, the post-conviction court denied the Petitioner's claim for post-conviction relief by written order entered December 17, 2010. In its order denying relief, the post-conviction court addressed a myriad of issues raised by the Petitioner and made several relevant findings.

First, the post-conviction court analyzed the Petitioner's claim that new scientific evidence established his innocence. In doing so, the post-conviction court reviewed the testimony of Lentini and the scientific conclusions that "much more research is needed on the natural variability of burn patterns and damage characteristics and how they are affected

by the presence of various accelerants" and that many of the "generally accepted methods of analysis indicating the use of an accelerant have been proven to be unreliable."

The post-conviction court found Lentini's testimony to be unavailing, stating that:

Mr. Lentini only testified about his record and accomplishments but nothing relevant to the case under examination. He simply stated that the fire in question was not started by the use of an accelerant but provided no basis upon which this conclusion was founded. Mr. Lentini basically just testified as to his opinion of the science and its evolution.

The post-conviction court also found that Cooper's trial testimony accounted for the possibility that radiant heat damage could sometimes be mistaken for a pour pattern:

Agent Cooper testified as to various "V-patterns" discovered in the house which he explained would indicate the use of an accelerant in the spread of a fire. With regard to such a pattern discovered underneath some baseboard removed from the living room, he stated that radiant heat damage can sometimes be mistaken for a pour pattern by less experienced investigators but that he possessed extensive experience that provided him with the ability to differentiate between the two. Agent Cooper apparently believed that the evidence pointed to the existence of an accelerant on the baseboard due to the fact that an accelerant would normally run underneath baseboards in this fashion. He also admitted that polyester meltdown from furniture could appear as a pour pattern[,] but he adamantly averred that he could discern between the two based upon his experience as a fire investigator.

The post-conviction court ultimately concluded that the Petitioner had "failed to submit sufficient proof at the evidentiary hearing to show that the fire analysis and investigation in this case was erroneous based upon obsolete techniques that have since been debunked."

The post-conviction court then reviewed the Petitioner's claim of ineffective assistance of counsel. Of relevance here, the court analyzed the Petitioner's claim that trial counsel performed ineffectively by failing to utilize Bayne's expertise and failing to call Dr. Roth as a witness.

First, the court concluded that trial counsel, in fact, had elicited the testimony from Bayne that the Petitioner complained was lacking. The court noted that Bayne testified at trial that the fire was accidental and not caused by the use of an accelerant. Further, Bayne

-18-

testified at trial that the burn pattern on the living room floor was a result of flashover. The post-conviction court concluded that the jury convicted the Petitioner despite this testimony.

The post-conviction court also concluded that the Petitioner had not been prejudiced by trial counsel's decision not to call Dr. Roth as a witness. Specifically, the post-conviction court reasoned that trial counsel had "elicited detailed testimony from Mr. Bayne explaining the patterns, locations and types of burns" on both the Petitioner and the victim and that Dr. Harlan also had testified as to the burn patterns on their bodies. The post-conviction court concluded that Dr. Roth's testimony would not have been helpful and that the Petitioner was not prejudiced by trial counsel's decision not to call Dr. Roth as a witness.

Finally, the post-conviction court addressed the Petitioner's argument that trial counsel had performed deficiently by failing to challenge on appeal the factual basis underlying Cooper's testimony. Citing this Court's opinion on direct appeal, the post-conviction court concluded that trial counsel, in fact, had attempted to disqualify Cooper as an expert at the Daubert hearing and had raised the issue on appeal. The post-conviction court quoted this Court's prior opinion, stating:

> [T]here was a sufficient indicia of reliability to support the trial court's decision to allow Mr. Cooper's expert testimony and that defense counsel's artful cross-examination of Mr. Cooper coupled with the defendant's presentation of a competing version of the fire's cause through the testimony of his own expert witness gave the jury ample opportunity to reject Mr. Cooper's testimony.

State v. Claude Francis Garrett, No. M2004-02089-CCA-R3-CD, 2005 WL 3262933, at *17 (Tenn. Crim. App. Dec. 1, 2005).

In sum, the post-conviction court concluded that:

> Although [trial] counsel was not able to render a favorable outcome for the [P]etitioner in this matter, it does not appear as though his representation fell below the standard demanded of criminal defense attorneys in such situations. [Trial counsel] was faced with the difficult task of developing and presenting a plausible defense to the charges with which the [P]etitioner was faced. [Trial counsel] fought zealously and wisely in his representation of the [P]etitioner, as evidenced by the rigorous cross-examination of the State's witnesses and the skillful questioning of the defense witnesses.

The Petitioner now appeals the post-conviction court's denial of his petition.  On appeal, he alleges that he received ineffective assistance of counsel at trial.

## Analysis

### *Standard of Review*

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006).  To prevail on a post-conviction claim of a constitutional violation, the  petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006).  See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise.  Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004).  We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence.  Momon, 18 S.W.3d at 156.  With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness.  See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

### *Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[7]  Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases."  Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act.  See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

---

[7] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution.  See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688)). Our Supreme Court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such

a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

### *Failure to Present Evidence of the Advancements in Fire Science*

The Petitioner first argues that he received ineffective assistance of counsel when trial counsel failed to present evidence that in the ten years between the first and second trials, the methods by which the State's expert witness reached his conclusion of arson had been discredited by the scientific community.

We note that this issue was not squarely addressed in the post-conviction court's written order denying relief. Rather, the post-conviction court's order addresses related issues raised by the Petitioner, including: (1) whether new scientific evidence in forensic analysis of fire investigations exists to prove the Petitioner's innocence; (2) whether trial counsel ineffectively utilized Bayne's expertise at trial; and (3) whether trial counsel failed to challenge on direct appeal the factual basis underlying the evidence presented by Cooper. Each of these issues is related to the issue that the Petitioner now raises on appeal; however, none of them fully encompass that issue.

From our review of the record, it is apparent that the post-conviction court's order addresses *ad seriatim* the issues raised in the Petitioner's amended petition for post-conviction relief. Thus, the issue that the Petitioner raises on appeal was not addressed in the post-conviction court's order denying relief because the issue was not stated as such in his amended petition. Under certain circumstances, we may be inclined to conclude that the Petitioner waived this issue by raising it for the first time on appeal. See State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995) ("A party may not raise an issue for the first time in the appellate court."). However, delving further into the record, it is apparent that the Petitioner, in fact, did raise the same issue previously in his original *pro se* petition, which was incorporated by reference in his amended petition.[8] Moreover, the issue clearly was litigated at the post-conviction hearing. Thus, we conclude that the issue was raised fairly below and will address it on appeal.

Although we have the post-conviction court's thorough findings on related issues, we lack findings of fact and conclusions of law on this particular issue. Following a post-conviction hearing, a post-conviction court is required to enter written findings of fact

---

[8] We conclude that the issue was raised in the *pro se* petition under ineffective assistance of counsel ground twenty-two.

and conclusions of law addressing all grounds for relief, see Tenn. Code Ann. § 40-30-111(b) (2003); Tenn. R. S. Ct. 28, § 9(A), but, as this Court has noted, the lack of such findings "does not always mandate a reversal of the trial court's judgment." State v. Swanson, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984). Because the purpose of written findings of fact and conclusions of law as to each issue is to facilitate appellate review, we need not reverse where the record is adequate for review. Id.; see also Rickman v. State, 972 S.W.2d 687, 692 (Tenn. Crim. App. 1997). In this case, the trial record and the evidence adduced at the post-conviction hearing adequately provide the substance of the Petitioner's claim. Additionally, the post-conviction court's findings on the related issues stated above, as well as its general denial of the petition, provide a basis from which we can discern the post-conviction court's conclusions. Thus, we conclude that an adequate foundation for appellate review exists and, therefore, will review the substance of the Petitioner's claim.

The defense's theory at trial was that the fire was the product of an accident, not arson. Toward this end, trial counsel hired Bayne as an expert in arson investigation to construct a credible defense and to assist trial counsel in preparing for and examining the State's expert witnesses. Bayne understood his role as providing a "technically defensible opinion" that the origin and cause of the fire was accidental in nature and offering that analysis at trial.

After considerable research and study, Bayne concluded that flashover had occurred during the fire leaving burn patterns on the floor. Bayne believed that Cooper mistakenly interpreted these burn patterns as indicative of the use of an accelerant, which also can leave similar burn patterns. Bayne believed that Cooper's fire scene examination did not satisfy the currently accepted scientific methodology, leading Cooper to mistakenly conclude that the fire was intentionally set. Bayne based his conclusions, in part, on NFPA 921, which he described to trial counsel as "the one and only document that represents the consensus of the fire investigation community."

At the post-conviction hearing, Lentini testified that NFPA 921 is the standard of care in fire investigations. Lentini testified that NFPA 921 was first published in 1992 as a guide for fire investigators. Lentini noted that, prior to the publication and acceptance of NFPA 921 as the standard in the field, arson investigators adhered to certain "mythologies" that had since been discredited by the scientific community. In describing one such mythology, Lentini quoted from a National Academy Report on the State of Forensic Science which concluded that:

> [M]uch more research is needed on the natural variability of burn patterns and
> damage characteristics and how they are affected by the presence of various

accelerants. Despite the paucity of research, some arson investigators continue to make determinations about whether or not a particular fire was set.

However, according to testimony presented to the committee, many of the rules of thumb that are typically assumed to indicate that an accelerant was used (e.g., alligatoring of wood, specific char patterns) have been shown not to be true. Experiments should be designed to put arson investigations on a more solid scientific footing.

Lentini explained that from reviewing the photographs in this case, he could determine that the fire went to flashover. This fact indicated to him that the floor lit on fire, which could have produced the evident burn patterns. Lentini was highly skeptical that Cooper could tell the difference, simply by visually inspecting the floor, between burn patterns caused by flashover and burn patterns caused by the use of an accelerant. Further, Lentini believed that Cooper's conclusion that he could tell the difference between the intentional and accidental use of an accelerant from visual inspection of the burn patterns was "beyond the scope . . . of what is valid or is generally accepted as valid in fire investigation."

Bayne raised these same concerns with trial counsel prior to trial. In emails, he told trial counsel that "much new evidence has come to light from testing since 1992 to show that one cannot distinguish pour patterns from other solid-fuel induced patterns by the patterns themselves . . ." and that the evidence Cooper intended to offer "was not generally accepted in the scientific community, especially since 1992." Bayne informed trial counsel that he intended to use NFPA 921 to rebut Cooper's testimony. He also recommended that trial counsel ask Cooper technical questions related to flashover conditions and effects. In one email, Bayne advised trial counsel to ask Cooper about "his uncertainty about the floor burn patterns" as well as "his respect for NFPA 921." Bayne also warned trial counsel, however, that Cooper would be testifying "as one who has learned much in the 11 years since the fire."

At trial, Cooper testified that the fire began in the front room and was deliberately set. He maintained that he had approached his investigation in a scientific manner. Cooper based his conclusions on several observations, including the exclusion of electrical or accidental causes, the burn patterns on the living room floor, the saturation of kerosene in the kitchen, the latched utility room door, and the disabled smoke alarm. Trial counsel asked Cooper to explain flashover, and, after doing so, Cooper admitted that the living room in this case appeared to have been fully involved in fire. He also acknowledged that flashover can occur with or without the use of an accelerant and that radiant heat from flashover can leave burn patterns on the floor. When asked whether he could distinguish between burn patterns caused by radiant heat and those caused through the use of an accelerant, Cooper acknowledged that it can be difficult and that less experienced investigators sometimes

mistake the two. However, Cooper maintained that he could tell the difference. Cooper also maintained that he did not base his decision solely on the presence of a pour pattern, but rather took that evidence and combined it with other indicia of arson, such as the kerosene soaked bedspread, the latched door, and the disabled smoke alarm. Cooper was not asked about NFPA 921 or advancements in the scientific community's understanding of fire science in the years between the first and second trials.

Testifying at the post-conviction hearing, Bayne believed that trial counsel did not question Cooper in the manner that Bayne had advised. Bayne stated, "[Trial counsel] did not follow my lead, the questions were disjointed, and they didn't connect with the path or the line of reasoning that I provided him." Bayne also believed that, had he been in the courtroom during Cooper's testimony, he would have been able to address particular discrepancies between the two experts' opinions.

In his own testimony at trial, Bayne stated that the fire had not been set on the floor using an accelerant but rather had started accidentally in the love seat. Bayne also testified that the floor burn pattern was "indicative of radiant heat and flash over." Bayne was not questioned specifically about NFPA 921, the evolving standards in fire investigation techniques, or about particular methodological errors in Cooper's investigation.

At the post-conviction hearing, Bayne identified a document that he prepared before trial containing potential questions for his direct examination. Bayne discussed several questions from this list that trial counsel did not ask him at trial. None of the proposed questions related to NFPA 921 or advancements in the understanding of fire science related to pour pattern recognition. Importantly, trial counsel believed that Bayne successfully communicated the defense's theory of the case at trial. Trial counsel was not asked at the post-conviction hearing why he had not questioned either Cooper or Bayne regarding scientific advancements between trials.

The Petitioner argues on appeal that the current scientific understanding does not support Cooper's testimony and that, through trial counsel's failure to point this out at trial, the jury was left with the impression that the two experts' opinions were equally weighted. After due consideration, we ultimately cannot agree with the Petitioner's position.

First, the evidence that the Petitioner submitted at the post-conviction hearing regarding the current scientific understanding of floor burn patterns is not as decisive as he contends. In this regard, we note that the Petitioner did not admit any portion of NFPA 921, which he purports represents the standard of care in the field. Thus, while the Petitioner complains that Cooper failed to abide by the industry standard, we can only speculate as to exactly what that standard requires. Moreover, Cooper was not presented as a witness at the

post-conviction hearing, so we also must speculate as to his familiarity and conformance with NFPA 921. We also note that the post-conviction court found that Lentini's testimony was not relevant specifically to the case at hand. This conclusion diminishes substantially the weight that we afford Lentini's testimony.

Further, the scientific developments that the Petitioner cites do not necessarily exclude the possibility that Cooper could have reached the conclusion of arson using the methods that he did. Lentini, quoting from the concluding paragraph of a scientific report, stated only that "*much more research is needed* on the natural variability of burn patterns and damage characteristics and how they are affected by the presence of various accelerants." (Emphasis added). The report continued that while "many of the rules of thumb" associated with the use of an accelerant "have been shown not to be true," "*[e]xperiments should be designed* to put arson investigations on a more solid scientific footing." (Emphasis added).

From this testimony, we conclude only that the scientific understanding of burn patterns is evolving and unsettled. More importantly, from the testimony at trial as well as the post-conviction hearing, it is apparent that burn patterns may be left on a floor during a fire *either* through the use of an accelerant *or* through radiant heat during flashover (or presumably, both). Critically, neither Bayne's nor Lentini's testimony at the post-conviction hearing negated the possibility that a burn pattern could be left from the ignition of an accelerant.

At trial, Cooper repeatedly stated that a burn pattern can be caused by either the ignition of an accelerant or radiant heat. Cooper believed that the burn patterns in this case were indicative of accelerant use while Bayne believed they were caused by radiant heat. Thus, the two possible interpretations of the burn patterns were presented to the jury even if the fact that the scientific understanding of burn patterns had changed was not. It is true that Cooper maintained that his experience allowed him to tell the difference between a burn pattern caused by an accelerant versus one caused by radiant heat. Perhaps trial counsel could have countered Cooper more effectively on this point. We do agree with the Petitioner that evidence of the changing standards in fire investigation methodology, to the extent that they differed from Cooper's methodology, could have helped the Petitioner's case. We, however, do not believe that trial counsel was deficient for failing to elicit such testimony, nor do we believe that a reasonable probability exists that such testimony would have changed the outcome of the trial.

Trial counsel was not asked at the post-conviction hearing why he chose not to ask Cooper or Bayne about advancements in fire science. However, there are plausible strategic explanations for trial counsel's decision. In an email sent in preparation for the Daubert hearing, Bayne cautioned trial counsel that in questioning Cooper on his current

understanding of fire science, Cooper would be "responding as one who has learned much in the 11 years since the fire." Bayne's concern appears to be borne out in the trial transcript. Cooper readily acknowledged that flashover can create burn patterns and that it appeared to him that the living room underwent flashover. That is, Cooper was aware of the alleged flaw in his methodology. Cooper maintained that, from his experience, and taking all factors into account, he believed that the burn patterns had not been created through flashover. Cooper's apparent knowledge of the subject matter could have led trial counsel to conclude that further examination would not have been helpful to the defense. In light of these possible strategic choices in this case, we again are mindful that "[j]udicial scrutiny of [an attorney's] performance is *highly deferential*," Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000) (emphasis added), and a petitioner alleging deficient performance bears a *heavy* burden of proving that his or her lawyer's performance was *not* within the realm of competent trial strategy. See Strickland, 466 U.S. at 689; Tracy F. Leonard v. State, No. M2006-00654-CCA-R3-PC, 2007 WL 1946662, at *20 (Tenn. Crim. App. July 5, 2007).

Moreover, trial counsel already had subjected Cooper to a thorough, multi-faceted cross-examination of his investigative methodology. This cross-examination highlighted many of the alleged flaws in Cooper's investigation even if the scientific standard from which his investigation deviated was not specifically examined. As this Court has previously stated, "cross-examination is a strategic and tactical decision of trial counsel, which is not to be measured by hindsight." State v. Kerley, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). In this Court's opinion on direct appeal, we stated that trial counsel subjected Cooper to a "rigorous" and "artful" cross-examination and that the jury was adequately provided with the defense's theory and given "ample opportunity to reject Mr. Cooper's testimony." State v. Claude Francis Garrett, No. M2004-02089-CCA-R3-CD, 2005 WL 3262933, at *17 (Tenn. Crim. App. Dec. 1, 2005). We continue to agree with this assessment and decline to find that trial counsel's cross-examination of Cooper was constitutionally deficient.

We likewise conclude that trial counsel did not perform deficiently in his direct examination of Bayne. As noted by the post-conviction court, Bayne communicated to the jury the defense's theory of the case, including his interpretation of the floor burn patterns. Trial counsel hired Bayne to help present a credible, technical defense, and he did so. The fact that trial counsel did not ask particular questions that Bayne requested of him is of limited consequence because, taken as a whole, trial counsel presented the defense's theory.

The Petitioner cites the Tennessee Supreme Court's decision in State v. Honeycutt, 54 S.W.3d 762 (Tenn. 2001), to argue that he is entitled to relief because trial counsel failed to advance a theory of defense readily available. In Honeycutt, the defendant was convicted of aggravated child abuse and raised an ineffective assistance of counsel claim on direct appeal, arguing that his defense attorney failed to present evidence implicating the child's

mother as the perpetrator. Id. at 765. The defense attorney knew prior to trial that the mother had access to the child in the hours preceding the injury, admitted that she had previously shaken the child, and admitted that she could harm the child because the child "got on her nerves." Id. at 768. Yet, the defense attorney failed to question the mother regarding this incriminating evidence and admitted that his failure to do so was not strategically based. Id. The supreme court reversed the defendant's conviction, holding that the defense attorney had performed deficiently by failing to develop an alternate theory of defense and that the failure to elicit testimony implicating the mother as the perpetrator prejudiced the outcome of the case. Id. at 769.

Upon our review of Honeycutt, we conclude that it is distinguishable from the case at hand. Honeycutt involved the complete abandonment of a defense theory supported by credible evidence that a different person had committed the crime. Here, trial counsel developed his theory of defense, i.e., that the fire was accidental. Additionally, trial counsel did not testify that his failure to ask all of the questions prepared by Bayne was not part of a strategic decision. Our review of the record indicates that trial counsel was never asked such a question. The Petitioner essentially complains that trial counsel did not use every bit of evidence at his disposal to discredit the State's theory. We do not read Honeycutt to impose such a standard.

We also conclude that the Petitioner did not establish prejudice to his case. Here again, we note that in both his cross-examination of Cooper and in his examination of Bayne, trial counsel communicated the defense's theory of the case. The jury was made aware that burn patterns can be caused by either the use of an accelerant or radiant heat during flashover. It then became the jury's prerogative to believe one expert's testimony over the other. Most importantly, Cooper repeatedly testified that the burn pattern on the floor was not the only evidence pointing to arson, but that the closed utility room door, the kerosene soaked blanket, and the disabled smoke alarm were also indicative of arson. In light of these facts, we conclude that the lack of further scientific questioning of either Bayne or Cooper does not warrant a finding that trial counsel's performance called into question the reliability of the outcome of the trial. See Pylant, 263 S.W.3d at 869. Thus, we conclude that the Petitioner is not entitled to relief on this issue.

*Failure to Call Dr. Roth as a Witness*

The Petitioner also contends that trial counsel performed ineffectively by failing to call Dr. Roth as a witness at trial. The Petitioner argues that Dr. Roth's testimony would have provided independent corroboration of the defense's theory that the victim and the Petitioner were situated similarly during the fire based on the similarity of their burn injuries. The State argues that evidence regarding the similarity of the burn injuries was presented

through Bayne and that trial counsel's decision to present this testimony through Bayne rather than Dr. Roth was a strategic decision.

The post-conviction court determined that the Petitioner was not prejudiced by trial counsel's failure to call Dr. Roth because testimony about the similarity of the burn patterns already had been elicited from Bayne and Dr. Harlan. We agree. Trial counsel presented evidence to the jury regarding the similarity of the burn injuries and the importance of the injuries to the defense's theory through the testimony of Bayne. While testimony from Dr. Roth regarding the burn injuries would have corroborated Bayne's testimony, the failure to adduce such additional testimony did not prejudice the Petitioner because the testimony would have been merely cumulative. Moreover, at the post-conviction hearing, Dr. Roth testified only that the burn patterns were similar and indicative of exposure to a very intense heat source. He could not opine whether the burns were consistent with the victim and the Petitioner's exposure to the same heat source at the same time. Thus, Dr. Roth's testimony was of limited corroborative value and would not have affected the outcome of the trial. Accordingly, we agree with the post-conviction court's determination that the Petitioner failed to show he was prejudiced by trial counsel's failure to call Dr. Roth as a witness at trial.

### *Failure to Move for a Mistrial After Previous Trial was Mentioned*

Finally, the Petitioner argues that trial counsel was ineffective for failing to move for a mistrial on any of the three occasions when the Petitioner's first trial was referenced by the State or the State's witnesses. The State argues that the Petitioner has waived the issue by failing to present it in his post-conviction petition or at the evidentiary hearing.

Prior to the start of the second trial, both parties addressed the trial court and agreed that the parties and witnesses should abstain from referring to the first trial so as not to inform the jury that a prior trial had taken place. Accordingly, the parties agreed to refer to the prior trial as a "prior proceeding." However, during the trial, two of the State's witnesses, as well as the prosecutor in closing arguments, nevertheless, referred to the prior trial.

The first reference occurred when the prosecutor asked Captain Jenkins whether he had previously seen certain photographs of the fire scene. Captain Jenkins replied that he had been "shown photographs at the previous trial." Trial counsel approached the bench and asked the trial court to "quietly suggest to this witness that he should not refer to the prior proceeding as a trial." The trial court agreed to do so, and the witness complied.

The second reference came when trial counsel asked Cooper on cross-examination whether he recalled his previous testimony on a particular question. As part of his answer, Cooper replied, "If that question was asked during the other trial – other proceeding – [.]" Trial counsel then interrupted Cooper's response by reading the prior question from the trial transcript. Trial counsel did not object or request a curative instruction.

The third reference came during closing arguments when the prosecutor told the jury, "I think smoke snuffed out the life of Lori Lance back in '92, and I think smoke created by Claude Garrett took her from us long before her time. I think smoke created by Claude Garrett filled that whole house on Broadway and brought us to this courtroom back in 1992." Again, trial counsel did not object or request a curative instruction.

Trial counsel did not move for a mistrial following any of these references to the prior trial. Additionally, while counsel attempted to raise the issue on appeal, he failed to include the issue in a motion for new trial. Consequently, in our prior opinion on direct appeal, this Court deemed the issue to have been waived. See Claude Francis Garrett, 2005 WL 326933, at *28.

Testifying at the post-conviction hearing, trial counsel recalled entering an agreement with the prosecutor to refrain from mentioning the previous trial. He recalled only one of the State's witnesses referring to the prior trial but allowed that others may have also done so. Trial counsel remembered objecting to this reference, but could not recall whether he raised the issue in the motion for new trial or on appeal.

Contrary to the State's position on appeal, while the Petitioner's amended petition seeking post-conviction relief did not raise the issue, his original *pro se* petition, in fact, did raise this issue.[9] Likewise, the Petitioner adduced some limited proof on this issue at the evidentiary hearing. Thus, we cannot agree with the State that the issue has been waived.

However, the post-conviction court's written order denying post-conviction relief does not contain findings of fact or conclusions of law on this particular issue. As noted above, a post-conviction court is required to enter written findings of fact and conclusions of law addressing all grounds for relief following a post-conviction hearing. See Tenn. Code Ann. § 40-30-111(b) (2003); Tenn. R. S. Ct. 28, § 9(A). However, because written findings are intended to facilitate appellate review, when the record is adequate, we nevertheless may review the case even without such findings. See State v. Swanson, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984). In this case, we are provided with the trial transcript, which contains the factual basis for the Petitioner's claims, as well as the post-conviction court's

---

[9] The issue was raised in the *pro se* petition under ineffective assistance of counsel ground four.

conclusion that the Petitioner failed to show deficient performance and prejudice to his case. Thus, we conclude that the record is sufficient for appellate review and deem it unnecessary to reverse the post-conviction court in order for that court to make findings of fact and conclusions of law with respect to this issue.

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A mistrial is appropriate "when the trial cannot continue, or, if the trial does continue, a miscarriage of justice will occur." State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). The decision whether to grant a mistrial is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. Id.

In our view, the record does not demonstrate any material prejudice to the Petitioner's case. After Captain Jenkins referred to the prior trial, trial counsel asked the court to instruct the witness to refrain from referring to it as such. When Cooper referred to the prior trial, he immediately corrected himself by saying, "prior proceeding." The prosecutor's remarks during closing arguments, while unnecessary, were somewhat vague. Although it would have been appropriate for trial counsel to have sought a curative instruction following any of these references, it is highly unlikely that a mistrial would have been granted. Moreover, trial counsel could well have believed it to be a better trial strategy to let these references, slight as they were, pass by without further attention. The references by the State and the State's witnesses simply did not give rise to a "manifest necessity" to stop the trial. Consequently, the Petitioner is not entitled to relief on this issue.

### Conclusion

For the foregoing reasons, we affirm the judgment of the post-conviction court denying relief.

_____
JEFFREY S. BIVINS, JUDGE